701 So.2d 391 (1997)
VLX PROPERTIES, INC., and CV Reit, Inc., Appellants/Cross-Appellees,
v.
SOUTHERN STATES UTILITIES, INC., Appellee/Cross-Appellant.
No. 96-1026.
District Court of Appeal of Florida, Fifth District.
November 7, 1997.
*393 Dennis K. Bayer and Gary L. Butler of Cobb, Cole & Bell, Daytona Beach, for Appellants/Cross-Appellees.
Tracy A. Bogert, G. Robertson Dilg and Kent L. Hipp of Gray, Harris & Robinson, P.A., Orlando, for Appellee/Cross-Appellant.
PETERSON, Judge.
VLX Properties, Inc. ("VLX"), appeals a final judgment denying its petition for inverse condemnation against Southern States Utilities, Inc., ("SSU"). C.V. Reit, Inc., ("CVR"), as the holder of a mortgage encumbering the title to real property owned by VLX, appeals the trial court's determination that it lacks standing to bring an inverse condemnation claim. SSU cross-appeals the trial court's rejection of its "reasonable use" defense that its discharge of reclaimed water into a pond was a reasonable co-use of that pond by a co-owner.

THE VLX APPEAL
In June of 1990, SSU entered into an Easement and Reclaimed Water Delivery Agreement ("Delivery Agreement") with Glen Abbey Golf Course, Inc. ("GAGC"), which granted to SSU the right to discharge certain reclaimed water onto GAGC's golf course. Because GAGC did not yet own all of the real property over which the reclaimed water was to be discharged, a Joinder and Consent addendum to that Delivery Agreement was executed by Lawyer's Title Investment Fund, Inc., ("LTIF"). LTIF, at the time of the execution of the Delivery Agreement, owned multiple parcels of land in the Glen Abbey planned unit development ("PUD") including nine holes of the golf course which it had contracted to sell to GAGC. LTIF eventually conveyed this portion of the golf course to GAGC, and conveyed its remaining ownership in the subdivision to appellant VLX.
The addendum signed by VLX's predecessor in title, LTIF, specifically provides:
[LTIF], as the owner and contract seller of certain portions of the real property known as the "Property", described in exhibit "A," of the [Delivery Agreement] executed between [SSU] and [GAGC], hereby joins in for the sole and limited purpose of consenting to the foregoing Delivery Agreement. This joinder shall not in any way abrogate or modify the contract for purchase and sale, as amended between [LTIF] and [GAGC] regarding said certain portions of real property.
The real estate described in exhibit "A" was that of the entire PUD, rather than the property intended to be encumbered by the agreement: the golf course. In other words, exhibit "A" included not only the golf course, but lands owned by LTIF that were not under contract to GAGC, as well as the property of several unrelated third parties. This scrivener's error formed the catalyst for this lawsuit.
The trial court found the legal description in the Delivery Agreement to be meaningless. It was persuaded by SSU to admit parol evidence to show, inter alia, that LTIF, by signing the Joinder and Consent addendum, intended not only to consent to the rights granted by its contract vendee, GAGC, but to additionally and independently convey an easement in favor of SSU over all its real property in the PUD. We agree with the trial court that parol evidence was permissible to clarify that the parties intended to have the easement cover only the golf course, i.e., land GAGC owned or was under contract to own, as opposed to the entire PUD as described in exhibit "A." We, however, disagree that parol evidence was permissible to interpret the intent of the Joinder and Consent addendum. SSU urged that the Joinder and Consent addendum was ambiguous because it is unclear whether the use of the term, "owner," was meant to bind LTIF as to "certain portions of the real property" that it owned apart from those lands which it had agreed to sell to GAGC, or if "owner" was simply a further clarification of the term, "contract seller." If it were the former, says SSU, the agreement would bind LTIF with respect to the LTIF real property later conveyed to VLX.
We do not find SSU's ambiguity argument to be reasonable. The last line of the addendum specifies that the "certain portions of real property" described in the first line of *394 the addendum (in which LTIF is described as the "owner" and "contract seller") refer only to those certain portions for which LTIF had a contract to sell to GAGC. The term "owner," in the first line, therefore, is simply a clarification of LTIF's status as the contract seller and does not refer to GAGC's status as an owner of other properties within the PUD. Further, the addendum contains absolutely no terms that would tend to create an easement or any other property interest in favor of SSU or GAGC over LTIF real property that was not under contract with GAGC. The addendum is simply a "consent" to the easement being granted by the contract vendee, GAGC, for real property then owned by contract vendor LTIF, but soon to be conveyed to GAGC.
SSU alternatively argues that even if the trial court erred by concluding that LTIF's Joinder and Consent addendum conveyed an easement to SSU, the error was harmless. SSU points out that a provision in the Delivery Agreement calls for a small body of water known as James Pond to be used as a holding pond for SSU's reclaimed water. A portion of James Pond is located within the confines of the golf course property sold to GAGC. SSU argues that because water, by its nature, is not static, LTIF, in consenting to water being stored in a portion of James Pond was consenting to water being stored in all of James Pond. The fallacy of this argument is that the Delivery Agreement drafted by SSU contains a provision permitting SSU to terminate the agreement if "the owner(s) of the bottom of the Holding Ponds fail or refuse to execute a flowage easement in favor of [SSU] over and within the Holding Ponds to allow [SSU] to utilize the full scope of the easement granted pursuant to this Agreement." SSU, by its inclusion of this language, exhibited its understanding of the concept that water, while fluid in nature, cannot be discharged onto the real property of others in a harmful manner, unless an easement permitting such a discharge is obtained from the affected property owner. Here, no such easement was obtained by either SSU or GAGC from LTIF or VLX, even though as SSU admits, it did pay $120,000 for a flowage easement from another co-owner of the real property underlying James Pond.
In summary, LTIF's consent did not convey any property rights to SSU beyond those rights SSU obtained from GAGC in the Delivery Agreement. GAGC obtained from LTIF only the latter's consent to GAGC's conveyance of the easement for storage and discharge of reclaimed water onto the golf course. Because the golf course did not include the entirety of James Pond, SSU's easement did not grant the right to substantially alter the water quality and quantity of the jointly owned pond. By asserting that an unauthorized public use of its private interests took place without compensation, VL X, contrary to the trial court's finding, possibly stated a cognizable claim for inverse condemnation against SSU. Martin v. City of Monticello, 632 So.2d 236 (Fla. 1st DCA 1994); South Florida Water Management Dist. v. Steadman Stahl, P.A. Pension Fund, 558 So.2d 1087 (Fla. 4th DCA 1990), rev. denied, 574 So.2d 143 (Fla.1990); Hillsborough County v. Gutierrez, 433 So.2d 1337 (Fla. 2d DCA 1983); Thompson v. Nassau County, 343 So.2d 965 (Fla. 1st DCA 1977); Elliott v. Hernando County, 281 So.2d 395 (Fla. 2d DCA 1973); Bensch v. Metropolitan Dade Co., 541 So.2d 1329 (Fla. 3d DCA 1989), rev. denied, 549 So.2d 1013 (Fla.1989); Dudley v. Orange County, 137 So.2d 859 (Fla. 2d DCA 1962), appeal dis'd, 146 So.2d 379 (Fla. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1014, 10 L.Ed.2d 12 (1963).
VLX also asserts that the trial court incorrectly concluded that VLX, at the time it acquired the property from LTIF, was on constructive notice of SSU's pipeline easement encumbering VLX's property.
In 1990, SSU obtained from LTIF a 15 foot wide pipeline easement but failed to record it in the public records. The pipeline parallels a platted road of the Glen Abbey subdivision for approximately 1,000 feet and then traverses two lots to reach the golf course. On this easement, SSU installed an underground pipe. Above the ground, SSU placed a manhole opening, a portion of a meter box concrete vault, and related telemetry equipment. The trial court personally viewed the above ground improvements and *395 found that they were substantial enough to constitute an open and obvious use of the property such that reasonable inspection of the property by VLX would have led to discovery of the pipeline easement.
If the use of the land was so open and obvious that a reasonable inspection would have revealed that use, VLX had a duty of "inquiry as one acquiring ... title to land so occupied to ascertain the nature of the rights the occupant has in the premises." Florida Power & Light Co. v. Rader, 306 So.2d 565, 566 (Fla. 4th DCA 1975). VLX failed to make such inquiry. The trial court, after hearing the testimony and inspecting the property, found that such an open and obvious use of the property existed at the time of VLX's purchase. Given the trial court's superior vantage point to judge this matter, we do not disturb his ruling that VLX had constructive notice of the pipeline easement. Fields v. Sarasota-Manatee Airport Authority, 512 So.2d 961, 964 (Fla. 2d DCA 1987), rev. denied, 520 So.2d 584 (Fla.1988) (factual findings of the trial judge are entitled to weight of a jury verdict).

THE CVR APPEAL
CVR's sole interest in this matter is as a holder of a mortgage on the realty VLX claims has been taken through inverse condemnation. CVR asserts that its interest as mortgagee entitles it to a position of standing to initiate an independent claim for inverse condemnation. The Florida Constitution provides in Article X, Section 6 that private property should not be taken for a public purpose without full compensation being paid to the "owner" thereof. A mortgagee of property in Florida has a lien interest rather than an ownership interest in property encumbered by its mortgage. Martyn v. First Federal Savings & Loan Ass'n of West Palm Beach, 257 So.2d 576, 578 (Fla. 4th DCA 1971), cert. denied, 262 So.2d 446 (Fla. 1972). Because CVR as a mortgagee does not have an ownership interest, we hold the trial court did not err in concluding CVR did not have standing to bring an action for inverse condemnation.

SSU'S CROSS APPEAL
SSU cross-appeals the trial court's rejection of its affirmative defense that its use of James Pond was a justifiable co-use of a body of water by a co-owner. Under the reasonable use rule, as it pertains to non-navigable natural lakes, a body of water owned jointly is available for use by all owners for any use that does not unreasonably interfere with the right of other owners. Duval v. Thomas, 114 So.2d 791, 794 (Fla. 1959). SSU asserts that, as an easement holder to a part of the pond, it had a right to discharge its "harmless" reclaimed water in the pond without obtaining a flowage easement from VLX. SSU argues that because the trial court found that the extent of the injury to the pond caused by the presence of reclaimed water was not proven, the trial court erred in not permitting SSU to use the defense of reasonable use. Although the trial court found it was unable to state specifically the exact extent of the injurious effect that may have resulted from the discharge of reclaimed water into James Pond, the court nonetheless made a finding that "the presence of reclaimed water has impaired the water quality of James Pond, ... the level of solids has increased, the oxygen content has been affected, and the levels of nitrogen, phosphorus and sediment have increased." Additionally, the trial court found that the level of discharge into James Pond contributed to the overflow of the pond's banks and to the flooding of portions of VLX's adjoining real property. We cannot conclude that the trial court abused its discretion in finding that SSU's discharge of effluent into James Pond was an unreasonable co-use of the pond under the reasonable use doctrine.

CONCLUSION
1. We reverse the judgment in favor of SSU on the inverse condemnation counts of VLX's complaint relating to the use and overuse of James Pond by SSU.
2. We affirm the holding that VLX is not entitled to relief for SSU's use of its pipeline easement on VLX's property.
3. We affirm the trial court's finding that the mortgagee, CVR, is not entitled to bring an action for inverse condemnation.
*396 4. We affirm the trial court's rejection of SSU's affirmative defense that SSU's use of James Pond was a reasonable co-use of a water body under the reasonable use rule.
REVERSED IN PART; AFFIRMED IN PART.
GOSHORN, J., concurs.
GRIFFIN, C.J., concurs in part, dissents in part, with opinion.
GRIFFIN, Chief Judge, concurring in part; dissenting in part.
Assuming this court has jurisdiction,[1] I believe the lower court correctly ruled that SSU did not inversely condemn the portion of James Pond owned by VLX.
Everyone appears to be in agreement that the question whether SSU has "taken"[2] an interest owned by VLX in James Pond depends on the meaning of two documents: (1) the "Easement and Reclaimed Water Delivery Agreement" entered into between SSU's predecessor (Glenn Abbey Golf Club, Inc.) ["GAGC"] and (2) the Joinder and Consent Addendum to that agreement, which was executed by LTIF, VLX's predecessor-in-interest. The lower court found the documents to be ambiguous and admitted parol evidence on the question of the contracting parties' intent. This evidence is clear, persuasive, even uncontradicted, that, indeed, LTIF did agree to SSU's use of James Pond to hold reclaimed water. LTIF's principal testified that, in executing the document on behalf of LTIF, he understood that LTIF was agreeing to SSU's right to detain and store reclaimed water in any of the holding ponds (including James Pond) located on or located adjacent to the property in which LTIF had an interest:
[W]e considered we consented to the agreement with the utility company about the water for the purpose ofto water the golf course and to fill up the lakefront water lots. Whatever it tookto get to that position, we were in agreementor consented.
The parol evidence shows that such storage capability was integral to the reclaimed water plan and that LTIF considered the addition of water into its ponds to be a benefit.
SSU is faced with this "takings" claim only because of our decision that the description of the property affected by the easement is not what is contained in Exhibit "A" of the easement agreement. The comprehensive legal description of the property attached as Exhibit "A" to the easement agreement includes James Pond. Although the majority agrees this legal description must be corrected, the majority declines to take this misdescription *397 into account in considering whether the agreements are ambiguous on the issue of permissive use of James Pond.
As set forth in the majority opinion, the addendum signed by LTIF provided:
[LTIF], as owner and contract seller of certain portions of the real property known as the "Property", described in exhibit "A," of the [Delivery Agreement] executed between [SSU] and [GAGC], hereby joins in for the sole and limited purpose of consenting to the foregoing Delivery Agreement. This joinder shall not in any way abrogate or modify the contract for purchase and sale, as amended between [LTIF] and [GAGC] regarding said certain portions of real property.
As the majority opinion also reflects, it is undisputed that LTIF was neither the owner nor the contract seller of all of the property shown on exhibit "A". Exhibit "A" is apparently a metes and bounds legal description that encompasses most of the Glenn Abby planned unit development. As we also know, however, LTIF was the owner but not the contract seller of certain portions of the real property described in Exhibit "A". In other words, of the overall property described in exhibit "A", some was owned by third parties, some was owned by LTIF and was sold to GAGC and some was owned by LTIF but ultimately not sold to GAGC. The disputed portion of James Pond falls into this last category. The majority agrees that there is an ambiguity here but finds that the only ambiguity is the "correct description of the lands set forth in Exhibit `A'". I think there is also an ambiguity in what LTIF, as owner, was consenting to allow SSU to do. It is important to keep in mind that the Reclaimed Water Delivery Agreement and Joinder were entered into in 1990, but GAGC did not actually acquire the property until almost two years later. At the time the agreement was signed and delivered, there existed the possibility that LTIF would convey as part of the golf course all of LTIF's interest in the bottom of James Pond. Ultimately, however, when the property was finally conveyed in 1992, only a portion of James Pond was conveyed to GAGC, not LTIF's entire interest in it. It is because of this ultimate retention by VLX of a portion of the bottom of James Pond that this lawsuit by VLX for inverse condemnation becomes possible.
Had GAGC ended up, as contemplated at the time of the 1990 agreement, with LTIF's entire interest in the pond bottom, there would have only been two owners of James Pond, GAGC and a third party not involved in this suit. SSU immediately went out and obtained a flowage easement from the other co-owner but sought no similar agreement with VLX, believing its agreement with LTIF secured for them the right to use James Pond. To say that a provision with the level of brevity of the "Joinder and Consent", where the joining and consenting party refers to itself in two different capacities as owning "certain portions" of the "real property known as the `property' described in Exhibit `A' of the Easement and Reclaimed Water Agreement," some of which it owned, and later sold, some of which it owned but later kept and some of which it didn't own at all, is clear and unambiguous so as to prevent the introduction of parol evidence is a proposition with which I cannot agree. The very fact that the parties entered into a comprehensive agreement for SSU to store and dispense reclaimed water over parcels of real property whose boundaries and ultimate ownership were uncertain creates an ambiguity. The erroneous legal description is the lynchpin; when it falls, the entire agreement becomes subject to construction. The trial court was correct in its conclusion that the document was ambiguous and required construction. The lower court's conclusion that the parties intended for SSU to have the right of use of James Pond is overwhelmingly supported by the evidence. I believe the lower court should be affirmed.
NOTES
[1] This appeal is from an interlocutory order determining that VLX and CV Reit, Inc. had no right of recovery on two counts of a multicount complaint. The two counts sounded in inverse condemnation. In essence, the order determined that SSU's discharge of water onto VLX's property did not constitute a "taking." The sole asserted basis for jurisdiction of this order is Florida Rule of Appellate Procedure 9.130(a)(3)(C)(ii), which allows interlocutory review of orders that determine "the right to immediate possession of property." Plainly, the appealed order does no such thing. A claim for inverse condemnation does not determine the right to possession. It determines whether interference with the owner's "bundle of rights" in his property sufficient to constitute a taking is a fait accompli, and if so, what compensation is due. Moreover, the appealed order determined that SSU had a right of use of the property based on the agreement with GAGC. Appellant urges that the appealed order has the effect of granting immediate possession of property to SSU, but a right to discharge water onto property is not a possessory right. Appellant relies on this court's decision in Crigger v. Florida Power Corporation, 469 So.2d 941 (Fla. 5th DCA 1985). Crigger resulted from complicated proceedings where the lower court entered an "order of taking" ruling that the utility had "full right of possession" of a right-of-way easement. As the dissent in Crigger pointed out, the appealed order did not establish a right of possession but merely established a date of appropriation of an easement. I agree with the dissent in Crigger and believe that we should recede from Crigger. In any event, Crigger does not control in this case. In Crigger, the court found an easement had been taken; in this case, the court found it had not. The appellate courts of this state have no business reviewing interlocutory orders denying inverse condemnation claims. If they are immediately reviewable under the present rule, the rule should be changed.
[2] The question whether the alleged "permanent invasion" can constitute a "taking" has not been addressed in this interlocutory appeal and I assume that by using the word "may," the majority does not decide it. Also, I remain in doubt that the court has jurisdiction to hear this appeal.