792 So.2d 504 (2001)
VLX PROPERTIES, INC., Appellant,
v.
SOUTHERN STATES UTILITIES, INC., et al., Appellees.
No. 5D99-3314.
District Court of Appeal of Florida, Fifth District.
May 21, 2001.
*506 Bruce A. Hanna and C. Allen Watts of Cobb Cole & Bell, Daytona Beach, for Appellant.
Gordon H. Harris, Tracy A. Marshall and Kent Hipp of, Gray, Harris & Robinson, P.A., Orlando, for Appellees.

ON MOTION FOR REHEARING EN BANC
HARRIS, J.
We grant en banc review of a panel opinion which reversed the trial court's decision that inverse condemnation had not been established because the trial court, the panel determined, had applied the wrong standard. The panel decision was based on our previous decision in this case, VLX Properties, Inc. v. Southern States Utilities, Inc., 701 So.2d 391 (Fla. 5th DCA 1997), hereinafter referred to as "VLX1." Because we find that this court erred in VLX1 and that to adhere to that decision would work "a manifest injustice," we recede from VLX1 and thereby affirm the decision on appeal. See Strazzulla v. Hendrick, 177 So.2d 1 (Fla.1965).
VLX is currently the owner of certain property which includes a portion of James Pond, the "property" at issue in this case. VLX obtained its interest from Lawyers Title Investment Fund (hereinafter "Lawyers") after the alleged acts relied on for inverse condemnation. James Pond is partially on property previously conveyed to Glen Abbey Golf Course, Inc. (hereinafter "Glen Abbey") for use in its golf course operation. The ownership of that portion of the pond not included in the sale to Glen Abbey remained under the ownership of Lawyers or other adjacent land owners.
Glen Abbey had for years irrigated its golf course from wells. However, when reclaimed water became available in the area, Glen Abbey was administratively prohibited from continuing to draw down ground water and was required to use reclaimed water to irrigate its golf course. It contracted with Southern States Utilities, Inc. (Southern States) to provide the irrigation services.
The agreement between Glen Abbey and Southern States contemplated that since reclaimed water would be placed into various ponds, including James Pond, Lawyers, still the owner of a portion of the pond after the sale to Glen Abbey, would have to join in the agreement confirming that it had no objection to reclaimed water being put into James Pond. Another requirement of the Glen Abbey/Southern States agreement was that flowage easements over the bottom of the pond would be obtained from all the other owners of James Pond who were not involved in the Lawyer's Title/Glen Abbey sales agreement. Lawyers joined in the agreement, which described the affected property as including all of the bottom of James Pond owned by it, and this agreement was recorded in the public records. Flowage easements were then obtained from all the owners who did not join in the agreement.
*507 Events then proceeded as intended and reclaimed water was placed into James Pond. Sometime thereafter, Lawyers conveyed its interest to VLX. VLX now claims that since the reclaimed water flowed not only over the property conveyed by Lawyers to Glen Abbey but also onto that portion of the pond retained by Lawyers after the sale to Glen Abbey, the actions of Southern States in putting reclaimed water into James Pond exceeded the authority granted by the Lawyers joinder. This is because, contends VLX, Southern States did not obtain a separate flowage easement from Lawyers. VLX claims that it is now entitled to compensation by way of inverse condemnation because the water was permitted to flow over that portion of the pond subsequently acquired by it. In effect, VLX contends that the water's flow should have been restricted by a metes and bounds "dam."
In VLX1, we interpreted the description of the property relating to the joinder to exclude property outside the sales agreement because of "scrivener's error." Scrivener's error, however, requires a mutual mistake. There is certainly no evidence that Glen Abbey or Southern States intended that the consent evidenced by the joinder was limited to only a portion of James Pond. We now believe that we erred in VLX1 by amending the legal description contained in the agreement.
After Lawyers executed the joinder agreement consenting to the water being put into ponds, including James Pond, "on and/or adjacent" to the property being conveyed by it to Glen Abbey, a separate flowage easement from Lawyers would have been redundant. Otherwise, its joinder would have been a mere sham, certainly not intended by any party. It is simply too fanciful to imagine that Lawyers intended that water be placed into the pond yet not flow beyond the golf course's invisible boundary. Further, had Lawyers expected to also sell a flowage easement over its adjacent portion of the pond, surely it would have said so in the joinder.
Indeed, as pointed out in the dissent in VLX1, the corporate officer of Lawyers confirmed that by joining in the reclaimed water agreement, it was intended that flowage throughout the pond would occur. Lawyers wanted the pond completely filled so that it could sell waterfront lots.
In VLX1, the majority held that because the reclaimed water agreement drafted by Southern States conditioned the agreement on Southern States being able to get flowage easements from the other owners of the bottom of the holding ponds (including James Pond), this shows that the parties understood that a flowage easement would be required from Lawyers. This proves just the opposite. The fact that Southern States obtained a flowage easement from all other owners of the bottom of the pond and yet did not seek one from Lawyers and then operated the reclaimed water service for a long period of time without objection from Lawyers, convincingly shows that Lawyers consented to the water flowing throughout the pond without expecting additional compensation. Again, this is demonstrated by the reclaimed water agreement in which Lawyers joined which described the ponds to be used as storage as being "on and/or adjacent" to the property subject to the agreement.[1] *508
*509 Precedent (stare decisis), and law of the case for that matter, is like tradition in that it provides a valuable connection to the past. It assists in providing consistency and predictability, both valuable qualities in law. But neither precedent (nor law of the case) should be used to institutionalize or justify error. We are no more perfect as judges than we are as individuals. We make mistakes. Neither the public nor the Bar expect us to always be right; they do expect us, however, to always be forthcoming. If it appears that we have made a mistake, we should not hesitate to correct it and, if it is still within our power to do so, we should mitigate any damage we have caused. Neither this court nor the law is served by our adhering to a previous position which we now believe to be wrong.
We recede from VLX1 and, on the basis of the tipsy coachmen rule, withdraw the current panel opinion and affirm the decision below.
AFFIRMED.
THOMPSON, C.J., GRIFFIN, PALMER and ORFINGER, R.B., JJ., concur.
COBB, J., concurs and concurs specially with opinion.
SHARP, W., dissents, with opinion in which PETERSON, SAWAYA and PLEUS, J., concur.
PETERSON, J., dissents, with opinion with which SHARP, W., SAWAYA, and PLEUS, JJ., concur.
COBB, J., concurring and concurring specially.
In this case the trial court has gotten it right twice, and that should be enough. What began as a simple, uncomplicated arrangement to water a golf course has evolved into a protracted quest for damages and attorney fees. That quest should now be terminated. The basic arrangement was set out in our opinion in VLX Properties, Inc. v. Southern States Utilities, Inc., 701 So.2d 391, 393 (Fla. 5th DCA 1997), hereinafter referred to as VLX I:
In June of 1990, SSU entered into an Easement and Reclaimed Water Delivery Agreement ("Delivery Agreement") with Glen Abbey Golf Course, Inc. ("GAGC"), which granted to SSU the right to discharge certain reclaimed water onto GAGC's golf course. Because GAGC did not yet own all of the real property over which the reclaimed water was to be discharged, a Joinder and Consent addendum to that Delivery Agreement was executed by Lawyer's Title Investment Fund, Inc., ("LTIF"). LTIF, at the time of the execution of the Delivery Agreement, owned multiple parcels of land in the Glen Abbey planned unit development ("PUD") including nine holes of the golf course which it had contracted to sell to GAGC. LTIF eventually conveyed this portion of the golf course to GAGC, and conveyed its remaining ownership in the subdivision to appellant VLX.
The so-called Delivery Agreement and the Joinder and Consent addendum thereto *510 were badly drafted, but the various parties involved apparently were content with the arrangement for some period of time. In 1991, Lawyers Title defaulted on the mortgage encumbering its property, and executed a deed in lieu of foreclosure to VLX, the designee of the mortgagee, C.V. Reit, Inc. VLX was a corporation formed by Reit to hold title to the property, which includes a portion of James Pond. All went well with the golf course and the surrounding development for several years until heavy rainfalls in 1993 caused James Pond, a repository for the storage of the reclaimed water, to overflow. This prompted VLX to file suit against SSU for inverse condemnation, asserting the "use and overuse of James Pond." See VLX I at 395.
The parol evidence at trial, which was accepted as fact by the trial judge in VLX I, was that Lawyers Title had consented to the use of its portion of James Pond (now owned by VLX) for purposes of storage of the reclaimed water piped to the golf course, and that VLX was on constructive notice of this fact giving rise to a duty of inquiry because of a foreclosure report furnished to it and because of recordation of the Delivery Agreement. Therefore, the "use" of James Pond for water storage by SSU was not a taking.
VLX also claimed there had been an "overuse" of the pond by SSU, causing flooding of its surrounding property in Unit Five. The factual finding by the trial judge in VLX I was that the extent to which the stored water contributed to the natural flooding "cannot be determined from the evidence presented," hence could not be a taking. The trial judge in the instant case reinforced this result by a factual finding that VLX was not ousted from all reasonable and beneficial use of its property by the flooding of James Pond into Unit Five, which was subject to natural flooding. See Associates of Meadow Lake, Inc. v. City of Edgewater, 706 So.2d 50 (Fla. 5th DCA 1998).
VLX's argument in respect to the water quality is irrelevant to an action for inverse condemnation. If the quality of the reclaimed water did not comport with the original agreement, that might give rise to an action for breach of contract or nuisance, but it would not constitute a taking necessary to support an action for inverse condemnation, which is the only action pled in the instant case. Moreover, the trial judge in VLX I made a factual finding that there was insufficient evidence to establish the extent of any injurious effect upon the water quality of James Pond as a result of the discharge of reclaimed water into it.
These various factual findings by the trial judges in this case and in VLX I have not been refuted or reversed; accordingly, VLX's inverse condemnation action must fail.
SHARP, W., J., dissenting.
The crux of this case is whether VLX's predecessor in title, LTIF, consented to the flowage easement into James Pond. If it did, then VLX is bound by that consent and should have no cause of action for inverse condemnation. If it did not, then it has such a cause of action.
The VLX-1[1] opinion addressed that issue specifically. It said:
In summary, LTIF's consent did not convey any property rights to SSU beyond those rights SSU obtained from GAGC in the Delivery Agreement. GAGC obtained from LTIF only the latter's consent to GAGC's conveyance of the easement for storage and discharge *511 of reclaimed water onto the golf course. Because the golf course did not include the entirety of James Pond, SSU's easement did not grant the right to substantially alter the water quality and quantity of the owned pond.
701 So.2d 391, 394. The trial court found in that case the quality of the water in the pond had been drastically and permanently degraded by SSU's discharge of "not so" reclaimed water.
VLX-1 also addressed the argument that because a small part of James Pond was within the golf course that LTFI had agreed to a flowage easement as to the whole pond, because of physical principles concerning the nature of water and diffusion.[2] This court said:
SSU, by its inclusion of this language [a provision allowing SSU to terminate the agreement if the owners of the bottom of the holding ponds fail or refuse to execute a flowage easement in favor of SSU over and within the holding pond to allow SSU to utilize the full scope of the easement granted pursuant to this agreement], exhibited its understanding of the concept that water, while fluid in nature, cannot be discharged onto the real property of others in a harmful manner, unless an easement permitting such a discharge is obtained from the affected property owner. Here, no such easement was obtained by either SSU or GAGC from LTIF or VLX .... (emphasis supplied).
VLX Properties, 701 So.2d at 394.
In sum, these determinations by VLX-1 were not based on weighty issues of law, but rather on the interpretation of various legal documents, on the language of the documents, and parole testimony. VLX-1 presents no conflict with precedent from this court before or after VLX-1 was decided (nor ones from other courts for that matter), and the case is not one of exceptional importance. See Fla.App. R.P. 9.331. It would not have been an appropriate case for an en banc rehearing of VLX-1, even if a timely motion had been made.[3] In my view, it is a bizarre and dangerous practice to use VLX-2 to reach back and redetermine VLX-1. Not to overstate the problem, but in my view, it puts "the law of the case" doctrine for this district in considerable disarray.
PETERSON, J., dissenting.
My dissent is directed toward the majority's opinion that overturns the "law of the case" established in VLX I. The effect of the majority opinion is to provide essential missing provisions in an easement and to excuse the necessity for clarity in drafting easements. In order to accomplish this, the majority ignores a legal misdescription of property, dispenses with the necessity of the title holder conveying title, dispenses with necessary words of conveyance, and violates this court's current precedent endorsing the "law of the case doctrine."

I. Prologue
This case was initiated in 1993. VLX I was released in November, 1997 and since that time the parties have planned the course of litigation on VLX I. Now, in the spring of 2001, the majority suddenly decides to recede from the law of the case established in VLX I when neither party had requested it and without the opportunity *512 to brief or argue the issue before this court. Valuable input by both sides of this controversy has been foreclosed because of the majority's decision that will be a complete surprise to both parties. I believe that basic fairness requires that the parties be given an opportunity to cite portions of the record and submit such legal arguments as are appropriate before the majority arrives at a conclusion based upon their version of what was intended by a contract, instead of concentrating on an analysis of what was included in a contract. Indeed, the basic difference between the majority's opinion and this dissent is that the majority's focus is not on the language of the contract upon which the controversy arose.

II. Delivery Agreement Deficiencies
It is the joinder and consent attached to the Easement and Reclaimed Water Delivery Agreement (Delivery Agreement) that should be the focal point of the majority's opinion, but instead the majority arrives at their own factual conclusions primarily from parol evidence offered by witnesses adverse to VLX Properties, Inc. (VLX), a corporation formed by Lawyer's Title Investment Fund, Inc.'s (LTIF) mortgagee to obtain a deed in lieu of foreclosure from LTIF of the land underlying that portion of James Pond that is the subject of dispute in this appeal. Obviously, the witnesses were not friendly to VLX.
Restricting examination in this litigation to the Delivery Agreement, I observe the following:
1. The two parties to the Delivery Agreement are Deltona Utilities, Inc., the predecessor of Southern States Utilities, Inc. (SSU), the appellee in the instant case and the party designated as Grantee in the Delivery Agreement, and Glen Abbey Golf Club, Inc. (GAGC), designated as Grantor in the Delivery Agreement.[1]
2. The very first provision of the Delivery Agreement after naming the parties is a recital that describes the property over which the easement is to extend. The recital gives that property a label that is used throughout the agreement. The label is "Property." The provision is as follows:
The Grantor is fee simple owner of or is under contract to purchase the property described in Exhibit "A" attached to and incorporated in this Agreement (hereafter "Property"), on which is located a golf course.
Exhibit "A" created the first catalyst for this litigation because it included the description of real property greatly in excess of the property of which GAGC, as grantor, was the fee simple owner or contract vendee, greatly in excess of any property devoted to a golf course, and greatly in excess of property owned by any party named in the Delivery Agreement. Exhibit "A" contained the legal description encompassing the entire Glen Abbey Planned Urban Development (PUD). GAGC only owned or was the contract vendee of the golf course in the Glen Abbey PUD. It is indisputable that GAGC had no fee simple or contract vendee interest in the excess property and that is the reason for the trial court's proper finding in VLX I that the legal description contained in Exhibit "A" was "essentially meaningless." In making the finding, the trial court reached the conclusion:
[B]ecause the legal description attached contains a large tract of land owned by *513 one unrelated landowner and approximately 613 other parcels of land owned by unrelated landowners .... I view the legal description as essentially meaningless and I would view it no different if they had simply attached the legal description for Volusia County found in Chapter 7 of the Florida Statutes.
This left the Delivery Agreement without a legal description of the lands in which GAGC had the fee simple or contract vendee interest. This was resolved through parol evidence which was necessary in order to determine the land in which GAGC had a fee simple or contract vendee interest.[2] It was an easy task for the trial court to arrive at a description through the use of deeds to define the property that GAGC owned on the date of execution of the Delivery Agreement and the land it subsequently obtained from the unnamed contract vendor, LTIF. Our opinion in VLX I affirmed that result and because the factual findings in the trial court's March 13, 1996 order were not challenged by either party in VLX I, those facts became the law of the case. See, e.g., Couture Fashions, Inc. v. Romay, 461 So.2d 235 (Fla. 1st DCA 1984) (noting that because the "appeal from the prior order was affirmed by this court without written opinion ... the findings of fact made by the deputy in his prior order have become the law of the case"); see also Mulato v. Mulato, 734 So.2d 477 (Fla. 4th DCA 1999); Thomas v. Perkins, 723 So.2d 293 (Fla. 3d DCA 1998); School Bd. of Seminole County v. Unemployment Appeals Comm'n, 522 So.2d 556 (Fla. 5th DCA 1988) ("The final decision of this court ... is final and binding on the parties ... as to the facts and issues upon which our adjudication was made.").
Clearly none of the land in which GAGC had a fee simple or contract vendee interest included the lands ultimately conveyed by LTIF to VLX. Moreover, the lands conveyed to VLX included the major portion of the land underlying James Pond. It should also be made clear that LTIF is not named in the entire Delivery Agreement nor is the word "James Pond" used in it although there is a reference to "holding ponds," the exact location of which are not set forth.
Following the language in the Delivery Agreement creating the easement from GAGC to Deltona Utilities, Inc., there appears an Exhibit "B," entitled "Joinder and Consent." The language contained in it is plain and uncomplicated. There is nothing in it that is so confusing that hours of testimony must be devoted to it in order to construe it. The VLX I opinion found that parol evidence was unnecessary to interpret the language contained in the Joinder and Consent. Although it is not clear from the majority opinion in this instant appeal, apparently it is this finding that the majority has determined is "manifestly unjust." The Joinder and Consent is set out in full as follows:

Joinder and Consent
Land Investment Fund, Inc., a Florida corporation authorized to do business in the State of Florida as the owner and contract seller of certain portions of the real property known as the "Property," described in exhibit "A," of the Easement and Reclaimed Water Agreement executed on the 5th day of April, 1990, between Deltona Utilities, Inc. and [GAGC], hereby joins in for the sole and limited purpose of consenting to the *514 foregoing Easement and Reclaimed Water Delivery Agreement. This joinder shall not in any way abrogate or modify the contract for purchase and sale, as amended between Land Title Corporation and [GAGC] regarding said certain portions of real property.

Attest: (witness) Land Investment Fund, Inc.
 (witness) By: T.J. O'Neil, President
 (corporate seal)
 (acknowledgment omitted) (emphasis added)
The word "Property" is bracketed by quotation marks in the same manner as it is in the first recital of the Delivery Agreement in which GAGC describes the "Property" as that in which GAGC had a fee simple or contract vendee interest.
Once the Delivery Agreement is supplemented with deeds showing the property to which GAGC held title at the time of execution of the Delivery Agreement and the lands that it subsequently obtained under its contract to purchase, it is clear that the title to the major portion of the land underlying James Pond never vested in GAGC. Therefore, GAGC never became a conduit by which Deltona Utilities, Inc. nor SSU could obtain title or an easement to lands GAGC never owned. It was impossible for GAGC to convey an interest in the title to that property which it never acquired.
The only confusion that I observe in the Joinder and Consent is the inconsistency in naming the owner, contract vendor, and titleholder. Land Title Corporation is named in the body of the Joinder and Consent as the contract vendor, Land Investment Fund, Inc. signed it, but in this litigation the parties indicate that LTIF, a stranger to the contract, was the title holder. There are allegations that Land Title Corporation was a name of a corporation that LTIF planned to form and convey title to those lands important to this appeal, but it was neither formed nor a conveyance made to it.[3] Since it never was formed nor did it ever hold title to lands, how can it be disputed that it had no legal ability to convey any interest under any interpretation of the Joinder and Consent? Additionally, neither the Delivery Agreement nor the Joinder and Consent could have constituted record notice of any interest that LTIF had because the grantee index of the official records of Volusia County would never had indexed the name of LTIF, a corporation completely absent from the Delivery Agreement. "Official Records" which afford notice are statutorily mandated to be indexed alphabetically by the names of the parties to the documents. See Lafitte v. Gigliotti Pipeline, Inc., 624 So.2d 844, 848 (Fla. 2d DCA 1993) (citing Fla. Stat. § 28.222(2)). Thus, the Delivery Agreement would be outside of VLX's chain of title.[4] I concede that both of these issues were not raised in VLX's brief, but I cannot bring myself to ignore this most important feature now that the majority has attacked VLX I.
The dissent in VLX I struggled to find an ambiguity in the phrase "owner and contract seller," to wit: that "owner" referred *515 to lands separate and apart from those contemplated by the "contract seller." As noted in the majority opinion in VLX I, however, the last line of the Joinder and Consent that specifies "said certain portions of real property" will be sold to GAGC, can only refer to the same "certain portions" described in the first sentence for which Land Title Corporation was "owner and contract seller." The phrase "owner and contract seller" clearly refers only to Land Investment Fund, Inc.'s purported status as both the owner and contract seller of those lands it intended to sell to GAGC.
Undaunted by GAGC's lack of title, the majority relies upon its own conclusion that the Delivery Agreement "contemplated that reclaimed water would be placed into James Pond ... [and that LTIF] still the owner of a portion of the Pond ... would have to join in the agreement confirming that it had no objection to reclaimed water being put into James Pond." But, nowhere in the Delivery Agreement or Joinder and Consent is either James Pond or LTIF mentioned. Absent also is the rationale for the joinder now gratuitously supplied by the majority.
No easement can be created without an accurate legal description and the proper title holder granting it and neither GAGC nor any of the named parties in the Delivery Agreement or Joinder and Consent was capable of passing title.

III. Absence of Words of Conveyance
The Joinder and Consent recites that Land Investment Fund, Inc. (not LTIF) was joining in the Delivery Agreement "for the sole and limited purpose of consenting to the foregoing ... [Delivery] Agreement." There is nothing in the Joinder and Consent that could possibly be interpreted as an effort to convey any perpetual exclusive easement to Deltona Utilities, Inc. The following summary of the recognized Florida rules regarding operative words of conveyance appears in Attorney's Title Fund, Inc., Fund Title Notes ¶ 10.03.04 at 190 (2000):
A question arises regarding which words are necessary in an instrument for it to be a conveyance of real property.
The black-letter law is that an instrument cannot be construed as a deed unless it contains operative words which are sufficient to manifest an intention to transfer title to an estate in the property described. No particular words are necessary. Words may be in either the past or present tense, but not in the future tense. One apt word is sufficient, although most deeds contain several. 26 C.J.S., Deeds, Sec. 28; and 2 PATTON ON TITLES (2d ed.), Sec. 341, n. 90.
The statutory warranty deed form in Sec. 689.02, F.S.1979, uses the words "has granted, bargained and sold." Words such as "remise," "release," "quitclaim," and "transfer" are generally considered sufficient to pass title. I FLORIDA REAL PROPERTY PRACTICE (CLE 2d ed.1971), Sec. 9.69. In Sanders v. Ransom, [37 Fla. 457,] 20 So. 530 (Fla.1896), the court commented that the word "assign" is not the usual operative word of a conveyance of real property, but held it to be sufficient.
Words and phrases such as "does will," "sign over," "covenants and agrees to convey," "covenants to warrant and defend title to named grantee," "is set off," "retained and have use of," "shall have and be entitled to at and after the death of the party of the first part," and "warrant and defend," have been held to be insufficient to pass title. See First Mortgage Corporation of Stuart v. deGive, 177 So.2d 741 (Fla. 2d DCA 1965); *516 26 C.J.S., Deeds, Sec. 28, n. 36 (emphasis added).
An instrument, which was apparently intended for use as a deed but which contains no words or phrase indicating that the grantor intended to convey the title, is considered defective and a new deed or other corrective action is needed before issuing a Fund policy.
The Joinder and Consent simply misses the mark in conveying any interest of the title holder, LTIF, in the largest portion of the land underlying James Pond. The required words of conveyance are missing, as well as the corporate title holder, LTIF.

IV. Parol Explanations of Deficiencies
What caused the Joinder and Consent Agreement to be so deficient and entices the majority to assist in SSU's plight by using this court to act as an after-the-fact conduit for the transfer of title to an easement from LTIF to SSU? Explanations were offered by SSU witnesses such as: 1) that a survey was unavailable to pinpoint the lands owned by GAGC and LTIF, and 2) that GAGC planned to obtain the title to the land in controversy. The survey problem and good intentions may explain the deficiencies, but they should not supply the deficiencies offered by the majority to defeat the interests of the present owner of the lands, an owner who was not a party to the Delivery Agreement.[5] As a bona fide purchaser for value, VLX should be burdened only with the easement that GAGC conveyed through the written text of the Delivery Agreement, not by the terms that biased witnesses desire the text to have included, after-the-fact, but did not include at the time of drafting.

V. Unreasonable Co-Use Issue
Eager to find some way of defeating VLX's quest for relief, the majority overlooks and recedes from holdings in VLX I that benefit SSU.[6] Additionally, the majority fails to address the VLX I affirmance of the trial court's rejection of SSU's affirmative defense that SSU's use of James Pond was a reasonable co-use of a body of water under the reasonable use rule. To the contrary, the trial court found that SSU's use was "markedly unreasonable."
VLX's major complaint and the probable cause of this litigation was that "[h]undreds of millions of gallons of ... effluent, unnaturally imported from distant watersheds, have permanently clogged the natural percolation of James Pond, affected its water quality, and when added to natural rainfall, have caused James Pond to rise far above its one-hundred-year expected flood elevation, permanently flooding the developable lands of VLX." Even assuming, as the majority indicates, that LTIF, a non-party to the Delivery Agreement, wanted to fill James Pond with the reclaimed water so that it could sell the upland residential property as "waterfront lots," it is absurd to find that LTIF's "consent" to fill James Pond included the *517 flooding of the upland residential lots adjacent to James Pond and perhaps the pollution of James Pond. The flooding of which VLX complains makes these so-called "waterfront lots," "underwater lots" unusable for their proposed residential purposes.
Focusing once more upon the actual terms of the Delivery Agreement, Deltona Utilities, Inc. specifically agreed that it was not authorized "to take any action that would unreasonably and adversely interfere with the use of [GAGC's] property as a golf course, or the power to change land use ...." Deltona Utilities, Inc. also agreed that it would not interfere unreasonably with GAGC's use of the property and would avoid any unreasonable and adverse interference with the normal use of the property. If the majority is including both GAGC's and LTIF's property in its definition of "Property," these prohibitions set forth in the Delivery Agreement should also protect VLX's property obtained from LTIF and allow VLX to seek relief on its claim that SSU engaged in an unreasonable co-use of James Pond. See, e.g., Tice v. Herring, 717 So.2d 181, 182 (Fla. 1st DCA 1998) ("The complaint ... clearly asserts that the appellee is using the easement across the appellant's property in a manner which exceeds the scope of the easement, and which was not reasonably contemplated."); Crigger v. Florida Power Corp., 436 So.2d 937, 946, 949 (Fla. 5th DCA 1983) (inverse condemnation claim where power company exceeded scope of easement granted).

VI. Manifest Injustice
The majority opinion waves the flag of "manifest injustice" to reach back and completely overturn the decision in VLX I. In doing so, the majority ignores Hodges v. Marion County, 774 So.2d 950 (Fla. 5th DCA 2001), this court's precedent on the issue of manifest injustice in which two members of the majority participated:
Marion County contends that the law of the case doctrine should not be applied in this case based on the "manifest injustice" exception, recognized by this court in Williams v. City of Minneola, 619 So.2d 983 (Fla. 5th DCA 1993). In Williams, the manifest injustice exception was applied with regard to an issue which had not been addressed in the previous appeal. Such is not the case here. Additionally, Marion County fails to articulate what manifest injustice it contends would result from adherence to the law of the case, other than its apparent belief that Hodges I was incorrectly decided. Such a contention does not support the application of a manifest injustice exception to the law of the case doctrine (emphasis added).
The majority raises no new issues to support its withdrawal of the law of the case. They simply conclude that VLX I was incorrectly decided with respect to an issue that was addressed in the previous appeal in order to ensure that no "large attorney's fees" are incurred, an issue not even ripe for consideration.

Conclusion
In conclusion, it is not VLX I that amends a legal description, it is the majority today that creates the amendment by adding to the Joinder and Consent attached to the Delivery Agreement as Exhibit "B" these previously omitted words: "Lawyers Title Investment Fund, Inc. hereby grants to Deltona Utilities, Inc. a perpetual exclusive easement to pump treated wastewater into James Pond and onto the adjacent residential lots irrespective of any flooding or pollution which might thereby occur." The majority also adds the missing signature of "Lawyers Title Investment Fund, Inc." In doing so and receding from VLX I, the majority *518 oversteps its bounds and establishes the bad law and precedent it condemns. It also weakens the confidence of these present litigants and all future litigants relying upon the law of the case doctrine.[7]
NOTES
[1] Perhaps the reader should now again read VLX1. The dissent's current justification for ruling for VLX has no resemblance to the former opinion. It is that former opinion that we are required to address in this majority. The issues that the dissent now claims we have ignored do not appear to have been raised by the parties and do not appear to have been considered by VLX1. The dissent has amended the facts of VLX1 (the parties to the basic agreement and the joinder in that agreement) in order to accommodate its new reasoning, perhaps hoping that the tipsy coachman rule will be applied to the original panel decision.

The author of VLX1 asserts that because the description in the "Delivery Agreement" included property not then owned by or contracted for by Glen Abbey, an easement could not have been granted over the additional property. Even though Glen Abbey could not grant an easement over property it did not own, it could agree by contract to provide storage over unowned contiguous lands if the owners of the contiguous lands agreed. There is no dispute that LTIF and the other owners who signed consents did own the property at issue and never objected to SSU's actions. The Delivery Agreement was merely a contract by which SSU agreed to provide irrigation services to properties owned by or to be acquired by Glen Abbey. By its terms, the Delivery Agreement contemplated that ponds contiguous to the golf course would be utilized to provide storage for the water to be used in the irrigation. All the owners of the contiguous property consented. Whether we refer to this consent as an easement or license, it is in any event a written, recorded agreement permitting SSU to use LTIF's and the other owner's land as it did. It does not matter that James Pond was not referred to by name in the agreement or joinder because the facts show, and everyone agrees, that James Pond was one of the contiguous ponds intended for storage. For that reason, LTIF, the contract vendor of additional golf course land (at least according to VLX1) to Glen Abby, was required to join in the Delivery Agreement, not merely the easement, and did so, subjecting not only the property subject to the anticipated sale but also contiguous lands over which it had an interest to storage of reclaimed water. The additional land was described, LTIF had an interest in the additional land sufficient to make the grant, and LTIF received consideration for doing so. This was the testimony of LTIF which was consistent with all the facts, testimony that the dissent now finds unworthy of belief because LTIF was not friendly with VLX. The dissent makes the irrelevant point that Glen Abbey never owned the property subsequently conveyed to VLX. We are not here concerned with whether Glen Abbey owned the contiguous property, we are concerned with whether LTIF owned a sufficient interest in it to subject it to storage of reclaimed water. If it did, as we find it did, then LTIF's subsequent conveyance to VLX was subject to such previous grant. The dissent now suggests that perhaps VLX was not bound by the recorded agreement because of some deficiency which would prevent constructive notice. Clearly neither VLX1 nor the parties hereto suggest any problem with notice. Perhaps that is because VLX either saw the agreement, was advised of the agreement by the former agent of LTIF who became employed by VLX or because it actually saw the irrigation process in operation in natural color. In any event, VLX never denied notice.
The admission herein that judges sometimes err is not an apology, "flowery, patronizing, retaliatory" or otherwise; it is merely, as all lawyers know and as so clearly demonstrated, one way or the other, by this case, a statement of unfortunate fact. The rules recognize judicial imperfection by permitting a rehearing, an appeal, an en banc review, and a petition for certiorari. Precedent recognizes it by decisions receding from previous decisions and, as in this case, changing the law of the case. The majority herein suggests that when it appears that we have made an error we admit it, correct the damage if we can, and move on rather than seek new reasons, not considered by the original panel or argued by the parties, to support the initial result.
The dissent urges that VLX should be bound only by the easement granted by Glen Abbey and not by the specific, recorded agreement executed by its predecessor in title permitting the storage of water on specifically described property owned by such predecessor and ultimately conveyed to VLX. Although the dissent now questions the name of the party entering into the joinder agreement, the issue was not raised below and in fact VLX1 assumed the joinder was binding on both LTIF and VLX or there would have been no need for the majority therein to redraft the description.
The dissent's "unreasonable co-use" point is also irrelevant. This defense would apply only if LTIF had not granted the right to use the property for storage. It clearly did.
Finally, the dissent challenges whether the manifest injustice of the case warrants receding from the law of the case. Manifest injustice is apparent when one enters into a contract permitting the performance of certain services, receives the consent of all applicable parties to perform the services, performs only the services contemplated by the agreement and the consents, and is sued for performing the contemplated services by the successor in interest of one of the consenting parties.
It is difficult to determine whether those concurring with the dissent do so because they agree with the original opinion (now apparently abandoned by its author), or the modified reasons (neither pled nor argued by either party), or simply believe (and this is apparently Judge Sharp's position) that the adherence to the "law of the case" is important enough to require a party who, on reflection, totally complied with its contract to pay damages and large attorney's fees. What has happened to the sanctity of contract?
[1] VLX Properties, Inc. v. Southern States Utilities, Inc., 701 So.2d 391 (Fla. 5th DCA 1997).
[2] The American Heritage Dictionary, Second College Edition at 396 defines "diffusion" as "the process of diffusing or the condition of being diffused." "Diffuse" is defined as "to pour out and cause to spread freely." Id. at 395.
[3] State v. Georgoudiou, 560 So.2d 1241 (Fla. 5th DCA 1990) (Cowart, J., dissenting); O'Brien v. State, 478 So.2d 497 (Fla. 5th DCA 1985); Fla. R.App. P. 9.331.
[1] Deltona Utilities involvement in the original agreement was not dispositive of the issues on appeal in VLX I; and therefore, this now relevant fact was omitted from the majority opinion in VLX I.
[2] The majority describes this common sense approach by the trial judge to arrive at a meaningful description as "the amendment" made to the description in VLX I. Surely, it is essential that an easement granted over lands be more definitely described than that shown as Exhibit "A" attached to the Delivery Agreement.
[3] I noticed this anomaly during the appellate proceedings in VLX I, but did not mention it because it was not then essential to the opinion. I feel constrained to do so now with the VLX I opinion under attack. To completely ignore this essential fact at this stage would indeed create "manifest injustice." The willingness of the majority to ignore the nonjoinder of the title holder in order to reach its result and because it was not mentioned in VLX I is incomprehensible. If the majority wishes to withdraw VLX I, it should go back to examination of the Delivery Agreement.
[4] The importance of correctly naming the parties to a recorded document is demonstrated by the indexing requirement. I do not suggest that VLX did not have actual notice of the existence of the Delivery Agreement that conveyed no interest by LTIF.
[5] Puzzling also is the omission of LTIF's mortgagee from the Joinder and Consent if the intent was to include lands that GAGC did not own or have an interest as contract vendee. C.V. Reit, Inc. is that mortgagee and the holder of the mortgage dishonored by LTIF. VLX was formed by C.V. Reit, Inc. to accept the deed in lieu of foreclosure from LTIF. If LTIF's property, in which GAGC had no interest, was to be encumbered by the Delivery Agreement, surely Deltona Utilities, Inc. would have insisted upon Reit's joinder and release of its mortgage with respect to the easement. Undoubtedly the majority would regard this as just another correctable oversight.
[6] VLX I concluded that VLX was not entitled to relief for SSU's use of its pipeline easement because the pipeline was open and obvious upon inspection and that C.V. Reit, Inc. was not entitled to bring an action for inverse condemnation.
[7] It is the "law of the case" doctrine that is involved in this case, not stare decisis as suggested by the majority opinion. See McGregor v. Provident Trust Co. of Philadelphia, 119 Fla. 718, 162 So. 323, 327, 328 (1935).

By "law of the case" is meant the principle that the questions of law decided on appeal to a court of ultimate resort must govern the case in the same court and the trial court, through all subsequent stages of the proceedings, and will seldom be reconsidered or reversed, even though they appear to have been erroneous. Or, as otherwise stated, "whatever is once established between the same parties in the same case continues to be the law of the case, whether correct on general principles or not, so long as the facts on which such decision was predicated continue to be the facts in the case."
Id. at 327 (internal citations omitted). Therefore, even if wrongly decided, we are without the ability to correct VLX I because neither SSU nor VLX contested the facts or presented any further factual evidence upon remand and neither has presented any evidence that our previous holding constitutes a manifest injustice.